# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.                               **Case No. 05-CR-306**

**CRAIG L. WRIGHT,**
**a/k/a Ralph Selby,**

      Defendant.

## RECOMMENDATION TO THE HONORABLE CHARLES N. CLEVERT ON THE DEFENDANT'S MOTION TO SUPPRESS

On January 24, 2006, the grand jury returned a two-count superseding indictment against the defendant, Craig L. Wright ("Wright"). The indictment charges Wright with falsely stating that he was not under indictment or information at the time he purchased a firearm (count one) and with possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year (count two). Wright filed a motion to suppress the firearm identified in count two. That motion has been fully briefed and is now ready for resolution.

### EVIDENTIARY HEARING TESTIMONY

As grounds for his motion to suppress, Wright claims that he did not consent to a search of his residence, located at 1222A South 17th Street ("17th Street residence") and that the consent provided by Kathryn Willis ("Willis"), his fiancé, was involuntary. The court conducted an evidentiary hearing to address Wright's motion on March 14, 2006. Testifying on behalf of the government were Milwaukee Police Officer Shawn Lauda ("Officer Lauda"), Milwaukee Police Detective Michael

Simonis ("Detective Simonis"), and Bureau of Alcohol, Tobacco and Firearms Agent Catherine Kaminski ("Agent Kamiski"). Wright testified on his own behalf and called Willis and her psychotherapist, Tiffany Prather ("Prather"), to testify. The witnesses' testimony relevant to Wright's and Willis' consent is summarized herein.

### I. Officer Lauda, Detective Simonis, and Agent Kaminski

A. <u>Entry into the residence and Arrest of Wright</u>

Officer Lauda, Detective Simonis, and Agent Kaminski and several other officers went to the 17th Street residence to execute a warrant for the arrest of Wright. Officer Lauda testified that Willis answered the door, allowed them to enter, Wright appeared, and Detective Simonis immediately took him into custody. (Tr. 7). Officer Lauda also said that Wright and Willis were the only occupants of the residence at that time, but several children subsequently came home from school. (Tr. 28-29).

Detective Simonis' testimony as to the officers' initial encounter with Willis varied slightly from that of Officer Lauda. Detective Simonis said that the officer approached the residence at the same time that two of Willis' children were returning home from school. (Tr. 30). The children knocked at the front door and entered the house when Willis answered it. (Tr. 30). The officers told Willis that they needed to talk to Wright and she yelled for him to come to the door. (Tr. 30). Wright appeared in a vestibule area near the doorway and Detective Simonis informed him that they had a warrant for his arrest. Detective Simonis indicated that Wright wanted the officers to come into the residence to explain the warrant to him, and the officers obliged. (Tr. 33).

Agent Kaminski testified that she was behind several officers when they approached the residence and did not clearly observe the encounter at the door. (Tr. 151). She was only able to testify that Detective Simonis arrested Wright upon entry into the residence. (Tr. 152).

2

B. Wright's Consent to Search the Residence

All officers are in agreement as to Wright's consent and the events that occurred immediately thereafter. Officer Lauda, within the presence of Detective Simonis, Agent Kaminski, and several other officers, asked Wright whether they could search the house for guns, and Wright gave his consent without objection. (Tr. 8-9, 35, 152). Detective Simonis then began making arrangements to transport Wright from the residence. (Tr. 35-36). While arrangements were being coordinated, Madison police officers arrived at the house in conjunction with an investigation of Willis' brother. Because Willis' brother was not on the premises, the Madison officers left and Wright was conveyed from the house. (Tr. 22, 36-37).

C. Willis' Consent to Search the Residence

Officer Lauda testified that he asked Willis whether he could search the house for guns. (Tr. 12). Although Wright had already consented to a search, Officer Lauda testified that he felt that he should also seek Willis' consent as a courtesy. (Tr. 13, 38). In addition, he felt that Willis would probably give her consent because she had been cooperative and had heard Wright previously consent to the search. (Tr. 12).

In response to Officer Lauda's request, Willis asked whether the officers had a search warrant and expressed concern that the officers would tear up her house during their search. Officer Lauda said they did not have a warrant, and told Willis the officers would not destroy the house. After that assurance, Willis consented to a search. (Tr. 12-14, 25). Agent Kaminski testified that she heard Willis give consent to Officer Lauda and said that Willis did not appear distressed at the time. Agent Kaminski also stated that no officer ever threatened to take Willis' children. (Tr. 153).

3

D. Officer Lauda's and Agent Kaminski's Search

After Willis gave her consent, Agent Kaminski joined Willis and Officer Lauda, and the three walked towards the bedroom. (Tr. 14, 27, 154). Agent Kaminski and Officer Lauda searched this room in Willis' presence. (Tr. 15, 154). Officer Lauda testified that, while he was searching in the closet, Agent Kaminski discovered the firearm specified in the indictment inside an unlocked safe, inside a dresser. (Tr. 15-16). Agent Kaminski described her discovery in more detail. According to her, she opened the cabinet and saw the safe. Then Willis approached, said "there's nothing in there," pulled a key out of her pocket, put it in the lock but did not need to turn the key because the safe was unlocked. (Tr. 156). Agent Kaminski then opened the safe and discovered the firearm. (Tr. 156). Agent Kaminski and Officer Lauda alerted Detective Simonis of their discovery and questioned Willis about who owned the gun. Initially, Willis indicated that she owned the gun but later recanted and said that the firearm belonged to Wright. (Tr. 16-17, 157).

Detective Simonis returned from outside the residence, where he was conveying Wright to a squad for transportation. (Tr. 39, 157). A picture car was summoned (Tr. 22, 154), and Willis signed Detective Simonis' notebook, indicating that she had given her consent to search the bedroom and the safe. (Tr. 17, 39-40, 159). According to Agent Kaminski, Willis never left the bedroom from the time that went there with the officers until the time she gave written consent to Detective Simonis. (Tr. 159).

The Milwaukee Police Department photographic record sheet indicates that the picture car arrived and took pictures of the gun and residence at 4:55 p.m. (Hrg. Ex. F.). Shortly thereafter, all officers left the residence, approximately two hours after they first entered the house.

4

## II. Wright

According to Wright, the officers came to the door at the same time as two of the children, Willis answered the door, and the children summoned Wright from the bedroom. (Tr. 120). As soon as Wright got to the entrance of the kitchen, officers pushed Willis aside, set Wright down in a chair and handcuffed him. (Tr. 122, 131). Detective Simonis and other officers then entered and advised Wright that he was under arrest because of guns. (Tr. 122). At no time did the officers request Wright's permission to search the house. (Tr. 123, 137-38).

Meanwhile, officers took Willis towards the back bedroom and asked her whether there were any weapons in the house and whether they could search the house. (Tr. 122). Willis repeatedly said no. (Tr. 122). However, Wright also testified that he observed Officer Lauda walking around in the bedroom and heard Agent Kaminski asked him what he was doing. (Tr. 137). Officer Lauda replied that he was searching the room, and Agent Kaminski told him not to do so because Wright was not the lease holder for the residence and Willis had not yet given consent. (Tr. 137, 140). Then, after approximately twenty to thirty minutes, during which Wright remained in the kitchen, officers transported Wright from the house. (Tr. 123, 140).

## III. Willis

A. <u>Consent to Search the Residence</u>

Willis' testimony about the events of the search contradicts that of Officer Lauda, Detective Simonis, and Agent Kaminski. Willis said that she answered a knock at her door and saw her two youngest sons with several police officers, who had their guns drawn. (Tr. 46, 53). The police asked whether Wright was at the residence, and her son went to get him. (Tr. 46). Wright approached the door and the police placed him under arrest. Immediately thereafter, the police separated Willis and

5

Wright, taking Willis into the bedroom and keeping Wright in the kitchen. (Tr. 47). Although Willis could see Wright from her position in the bedroom, she could not hear conversation that Wright had with Detective Simonis and, at no time, did she hear Wright give his consent for the officers to search the house. (Tr. 48, 67-68).

A male officer repeatedly asked Willis if they could search the residence and, at one point, a female officer asked Willis whether Wright was worth losing her kids and having her house torn up. Initially, Willis denied the officers' requests to search and said that the officers must get a warrant to search the residence. (Tr. 48-51, 66). Willis also says that she asked the officers to leave once they removed Wright from the premises, but the officers refused. (Tr. 51-52). However, after the officers persisted in requesting to search the residence, said that it would take hours to obtain a search warrant, and told Willis that they were going to take her kids when a warrant was obtained, Willis consented to a search. (Tr. 52). Willis testified that she did so only because she was afraid and believed that the officers might take her children. (Tr. 52-53).

B. Firearm Seizure

Willis' testimony as to Agent Kaminski's discovery of the firearm differed from that of the officers as well. Willis testified that, after she consented to a search of the residence, the officers focused on the bedroom. (Tr. 53). The female officer opened the dresser in her bedroom, observed the safe, and asked Willis what it was. Willis told her it was a safe that could be opened with a key and immediately took the key from her pocket and gave it to the officer. The officer then opened the safe and seized the gun. (Tr. 54).

On cross examination, however, Willis testified to a different course of events. Willis said that she left the bedroom and went to the kitchen to consult with Prather. (Tr. 71). Willis asked Prather

6

whether the officers could take her children if she did not permit them to search the residence. (Tr. 71). Prather responded that the officers could not take her children but told Willis that, if she was scared, she should consider which is more important, her kids or having the officers search the house. Then, despite the foregoing testimony about consenting to the search, Willis went on to testify that the officers had already discovered the safe at that point and, based on her conversation with Prather, Willis returned to the bedroom and decided to give Agent Kaminski the key to the safe. (Tr. 71-74).

After the firearm was discovered, Willis testified that the officers summoned Detective Simonis, who had transported Willis from the residence. Approximately twenty minutes later, Simonis arrived back at the house. (Tr. 54). Detective Simonis asked Willis to sign his notebook to memorializing her consent, and she did so without reading what Detective Simonis had written. (Tr. 54-55, 85). Another hour passed until the picture car arrived, and the officers left shortly thereafter. (Tr. 54-55). During the course of the encounter, Willis said that her children were throughout the house and some stayed in the kitchen with Prather, who remained at the residence until the officers left. (Tr. 70).

C. <u>Pre-hearing Meeting with Defense Counsel</u>

Willis also testified regarding a February 23, 2006 meeting that she had with defense counsel. The purpose of that meeting was to prepare for Wright's evidentiary hearing, which had been scheduled to commence February 27, 2006. Shortly after arriving at defense counsel's office, Willis said that she had just been shot that afternoon. (<u>See</u> Mot. to Adjourn Hrg. Feb. 23, 2006 at 2). In light of her alleged injury, and the defendant's claim that Willis was his chief witness, the court rescheduled the evidentiary hearing to March 14, 2006.

7

At the evidentiary hearing, Willis testified that she was not shot on the day she met with defense counsel and could not remember making that statement. According to Willis, she had reacted negatively to antidepressant medication that she took for the first time and was delusional. (Tr. 55-56, 77-80).

### IV. Prather

Prather is a psychotherapist who visited Willis and her family. (Tr. 92). She testified that she had an appointment to meet with Willis on the day of the search, and arrived at the residence between 4:00 and 4:15 p.m. After Prather indicated that she was visiting Willis, and not Wright, officers allowed her into the residence. (Tr. 93). Upon arrival, Prather went to the kitchen and attempted to calm down Willis' five children. (Tr. 94, 102). Initially, Prather did not have contact with Willis, who was in the bedroom. However, Willis did comment to Prather that the officers were waiting to obtain a search warrant, and a male officer confirmed this. (Tr. 93).

Later, Willis came into the kitchen and asked Prather whether the officers could take her children. (Tr. 95, 103). Although Prather had not heard any of the officers threaten to take Willis' children (Tr. 103), Prather responded that she could not give legal advice, suggested that Willis cooperate, and recommended that Willis consider what was most important to her. (Tr. 95). Willis then went back into the bedroom, where Prather perceived that the officers were conducting a search. (Tr. 95). Approximately fifteen to twenty minutes later, Prather heard a male officer comment that the officers could either open the safe there or take it back to their office. (Tr. 113). Prather did not see the safe, did not hear other officers respond to the comment, and said that she was only able to hear this comment from the kitchen because the male officer who was speaking had a louder voice than the other officers. (Tr. 114).

In terms of the sequence of events that occurred, Prather testified that approximately forty-five minutes to an hour passed from the time that she arrived until the time that "activity" escalated; that the officers left between 6:15 p.m. and 6:30 p.m.; and that she remained at the residence until approximately 8:00 p.m. (Tr. 95-96). At no time did Prather observe a picture car arrive or anyone taking pictures. (Tr. 115).

**ANALYSIS**

Resolution of Wright's motion depends on the court's credibility determination. If the court gives credence to the officers' account of events— in which Wright gave his consent to a search of the home shortly after his arrest— the motion to suppress must be denied and the validity of Willis' subsequent consent is not relevant. However, if Wright did not consent as the officers say <u>and</u> the court finds that Willis' consent was involuntary, the motion to suppress should be granted.

With respect to the issue of Wright's consent, the court finds the officers' testimony more credible than the testimony of Wright and Willis. The court makes this determination for several reasons. First, all of the officers testified consistently in regard to Wright's consent, and Wright's consent is also documented in one of Detective Simonis' reports. Wright argues that the court should not consider Detective Simonis' report because it was not included in the government's initial discovery disclosures. The government says that the report was omitted from discovery materials in error and notes that the report was available to defense counsel before questioning Detective Simonis at the evidentiary hearing. (Gov. Post-hrg. Resp. at 3). In addition, the government indicates that there is no evidence that the report is fabricated and, in the opinion of the court, Wright's consent also comports with Wright's own testimony. While Wright said that he did not consent to the search, Wright also testified that he heard Agent Kaminski tell Officer Lauda not to search the residence

9

because Wright was not the lease holder. Wright's testimony means that Wright gave his consent, and thereafter, Agent Kaminski was discussing whether Wright had authority to consent. At the evidentiary hearing, Wright challenged only the fact of his consent, conceding that the search was lawful if his consent was given. Thus, based on Wright's consent, the court will recommend that the motion to suppress be denied.

This means that the court need not address the validity of Willis' consent, which Wright argues was involuntary because it was given out of fear that the officers would take Willis' children. Even if her consent were determinative, however, the court does not not find Willis to be a credible witness. As an initial matter, Willis told defense counsel that she had been shot. At the evidentiary hearing, Willis admitted that did not happen. While Willis claimed that she was delusional at the time she made that statement to defense counsel because of her medication, Willis was unable to recall specifics about the medication and, in discussing the side effects from her antidepressants with Prather, Willis mentioned only diarrhea, agitation, and loss of appetite. (Tr. 106). Willis also conceded that she made false statements to Officer Lauda and Agent Kaminski regarding the gun found in the safe. Willis initially said that the gun found in the safe was hers, then said it belonged to her brother, and then recanted a second time and said the gun belonged to Wright. At the evidentiary hearing, Willis testified that the gun was her brother's and not Wright's. These admittedly false statements by Willis to defense counsel and to the officers weigh against her credibility.

Moreover, Willis presented inconsistent testimony or, at a minimum, testimony that reflects an unclear recollection of the events of the search. For example, it is unclear from Willis' testimony whether she immediately gave the key to the safe to Agent Kaminski—as Agent Kaminski claims and as Willis stated on direct examination—or whether Willis left the room to consult with Prather before

Case 2:05-cr-00306-CNC   Filed 04/20/06   Page 10 of 12   Document 39

making her decision and then returned and gave Agent Kaminski the key, as she stated on cross examination. Willis also said that she turned to Prather for advice about the consequences of not consenting to a search of the residence. She then went on to testify, however, that the officers were already searching the residence at the time she spoke with Prather, had discovered the safe, and that Prather's advice caused her to give Agent Kaminski the key to the safe. In addition, contrary to the testimony of all other witnesses, Willis also said that Detective Simonis left the residence and that it took him twenty minutes to return after the firearm was found.

While Willis may have been concerned about her children, who were upset when Wright was arrested and during the search, the court finds that any perception of risk to the children was not the result of threats by the officers. The alleged threats by the officers belie the nonviolent and relatively calm circumstances under which all witnesses testified that Wright was arrested and the search was conducted. In fact, it is undisputed that the officers accommodated Wright by allowing him to give money on his person to Willis prior to his arrest, so that she could buy Christmas presents for the children. The officers also ensured that Wright had taken the medication he needed before removing him from the residence. In addition, Willis herself testified that Detective Simonis treated her well, as he had in their past encounters, that she felt comfortable talking to Detective Simonis, that the officers were fair, and that the officers did not act upright, mean, or dirty. (Tr. 58, 69.).

While Prather indicated that she believed the officers had threatened to take Willis' children, Prather also said that she did not hear any of the officers make that threat. The source of her belief was Willis. Moreover, Prather came to the residence in the middle of the search, spoke with Willis only briefly, did not observe the gun or the safe, and did not know that a picture car arrived during the time she was at the residence or observe photos being taken. It is clear that her attention was focused

on Willis' five children—with whom she remained in the kitchen for the duration of the search—and not the officers or Willis. Accordingly, the court accepts the officers' testimony and concludes that they did not threaten to take Willis' children. Thus, the court finds that the search of the 17th Street residence was authorized based on either Wright's or Willis' consent and will recommend that Wright's motion to suppress be denied.

For all the reasons discussed, the court now enters the following recommendation on Wright's motion to suppress:

**IT IS THEREFORE RECOMMENDED** that the motion to suppress be **denied.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59 (b)(2), and General Local Rule 72.3 (E.D. Wis.); whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

Dated at Milwaukee, Wisconsin this 20th day of April, 2006.

s/AARON E. GOODSTEIN
United States Magistrate Judge